IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| GAIL WASHINGTON, | ) | Civil Action No. 3:08-2631-DNC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff applied for DIB and SSI in March 2006, alleging disability as of January 1, 2005,[1] due to low back pain, arthritis in her knees and ankles, high blood pressure, carpal tunnel syndrome, obesity, and depression. Plaintiff's applications were denied initially and on reconsideration, and she requested a hearing before an administrative law judge (the "ALJ"). After a hearing held October 15, 2007, at which Plaintiff appeared and testified,[2] the ALJ issued a decision dated November 9, 2007,

---

[1]Plaintiff originally alleged a disability onset date of January 1, 1992, but later amended that date to January 1, 2005, the date she last worked. (Tr. 22, 36-37, 107).

[2]Plaintiff, who is currently represented by counsel, was unrepresented at the hearing before the ALJ.

finding that Plaintiff had the residual functional capacity to perform unskilled sedentary work and was, therefore, not disabled within the meaning of the Social Security Act.

Plaintiff was forty-seven years old at the time of the ALJ's decision. She has a ninth grade education with past relevant work as a cook and tomato sorter. (Tr. 35, 38, 96-97, 100).

The ALJ found (Tr. 24-30):

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since January 1, 2005, the onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe combination of impairments: obesity, tachycardia, and carpal tunnel syndrome (20 CFR 404.l520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: sit for 6 hours of an 8-hour day; stand/walk for 2 hours of an 8-hour day; frequently lift/carry light items; and occasionally lift 10 pounds.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 16, 1960 and was 45 years old, which is defined as a younger individual, on the disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to a determination of disability because applying the Medical-Vocational Rules directly supports a finding of

"not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (Tr. 2-6). Plaintiff then filed this action in the United States District Court on July 23, 2008.

## SCOPE OF REVIEW

The Social Security Act (the "Act") provides that, for "eligible"[3] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[4]

In evaluating whether a claimant is entitled to disability benefits, the ALJ must follow the five-step sequential evaluation set forth in the Social Security regulations. See 20 C.F.R. § 404.1520.

_____

[3]Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

[4]The regulations applying these sections are contained in different parts of Title 20 of the Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and Part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations are identical, the citations in this report will be limited to those found in Part 404.

The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy.  See id.

The scope of judicial review by the federal courts in disability cases is narrowly tailored. Thus, the only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).  Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)).  Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

 Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).   It must do more, however, than merely create a suspicion that the fact to be established exists.  Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

<u>**DISCUSSION**</u>

In her brief before the court, Plaintiff alleges that the ALJ erred in failing to: (1) find that her arthritis and sleep apnea were severe; (2) assess whether her sleep apnea met a "Listing"; (3) further develop the record; (4) find that she cannot perform the full range of "sedentary" work; and (5) obtain testimony from the vocational expert. The Commissioner contends that the ALJ's decision is supported by substantial evidence and free of legal error.

**A.      Failure to Develop the Record**

Plaintiff does not raise this issue first, but the undersigned finds it best to do so, as it impacts the others. Plaintiff contends that the ALJ committed reversible error in failing to fully develop the record. The burden to prove disability in a social security case is on the claimant, and to meet this burden, the claimant must furnish medical and other evidence of the existence of the disability. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987); <u>see also</u> 20 C.F.R. § 404.1512.

The Commissioner, however, also has a role in this fact-finding, <u>see id.</u>, and it is well established in the Fourth Circuit that a claimant, appearing pro se, is "entitled to the sympathetic assistance of the ALJ to develop the record, to assume a more active role and to adhere to a heightened duty of care and responsibility." <u>Crider v. Harris</u>, 624 F.2d 15, 16 (4th Cir. 1980) (internal citations omitted). When presented with a pro se claimant, the ALJ is charged to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." <u>Marsh v. Harris</u>, 632 F.2d 296, 298 (4th Cir. 1980) (internal citations omitted). If the ALJ's failure to do so results in less than a "full and fair hearing of their claims," then "good cause" may be available to remand "for the taking of additional evidence." <u>Sims v. Harris</u>, 631 F.2d 26, 27

(4th Cir. 1980) (citations omitted).  Such good cause, however, is dependent on a showing that "absence of counsel created clear prejudice or unfairness to the claimant."  Id. at 28.

Plaintiff's complaint here stems from events at her hearing.  The hearing transcript reveals that the ALJ was familiar with Plaintiff's record, and he questioned her as to her different impairments.  (See Tr. 38-45).  When the ALJ asked who was treating her "this year," Plaintiff responded that she had "different doctors" because she had no medical insurance, "So, I was just going to like the emergency room, and stuff like that."  (Tr. 39).  The ALJ asked Plaintiff to be more specific, and she answered, "To [the Medical University of South Carolina ("MUSC")]and Roper."[5] (Id.)

The ALJ delved further:

Q:    And what have you been going for at MUSC and Roper?

A:    My heart.  My medical – I had to go in the hospital in – well, in January, they kept me for like a week and a half for my heart.  . . .
. . .
      For my heart and a blockage in my arteries.
. . .

Q:    Now, you said you went to MUSC.  What did you go to Roper for this year?

A:    The same thing.

Q:    Were you in the hospital?

A:    Hard breathing.  No, no, sir, they didn't keep me.  I couldn't stay.

(Tr. at 39-40).  After some questioning regarding Plaintiff's medications, the ALJ asked again:

---

[5]"Roper" can apply to any one of several different entities of Roper St. Francis Healthcare. See Roper St. Francis Healthcare, http://www.rsfh.com/Categories/Facilities/Documents/systemmap flyer7.09.pdf (listing 17 different locations).

Q:     And there's no specific doctor that's been treating you all along?  You've been seeing different doctors?

A:     Yes, sir, for the same thing.

Q:     Okay.  Now, you've talked about heart.  Have you been treated for any other problems other than your heart this year?

A:     In February of this year here, I found that I had – was no oxygen flowing from my brain to my heart, or something like that, that (INAUDIBLE).  I've got to sleep with a machine every night.

(Tr. at 41-42).  The ALJ correctly guessed that Plaintiff was referring to her obstructive sleep apnea.

At the end of the hearing, the ALJ spoke directly to Plaintiff:

Here's what's going to happen, Ms. Washington, okay?  I don't have all the records, okay?  And, and, and the reason why I don't have all the records is because you were hospitalized in January of this year, okay?  I don't have those records, okay?  And obviously, *if you went to Roper at all*, I don't have those records, as well.  So, what I have to do in order to make sure I have everything is, I will have to, after this hearing is over, contact MUSC, *and contact Roper*.  I will update the treatment records for you for this year.  After I've gotten all those records, I will make a decision, okay?

. . .

[I]t doesn't work that, that, you know, we do it when – if we don't know, if we don't know the information, okay?  And, and, as I said – that's why I asked you at the beginning of the hearing if we have anything.  And obviously, I have to get that.  You've had some significant treatment for your heart, okay?  When they hospitalize you for 10 days, that's pretty significant.  I have to get those records.  Once I have those records, I'll make the decision, and I'll enter it.  Thank you.

(Tr. 47-48)(emphases added).

Thus, the ALJ perceived a gap in Plaintiff's treatment records, and the final transcript shows that he was at least partially effective in filling that gap, as there are records from MUSC dating through August 2007.  (See Tr. 234-406).  The transcript also shows that the ALJ acted on his representations quickly; the first page of these records is date-stamped "RECEIVED" October 15,

2007 – the same day as Plaintiff's hearing. (See Tr. 234). These records detail Plaintiff's 2007 treatment for bronchitis, pneumonia, and pulmonary edema in January (spanning six days); her sleep study in February; an overnight hospitalization for congestive heart failure in May; and an emergency room consultation for headache and chest pain in August.

Plaintiff argues, however, that the ALJ erred in not obtaining her medical records from Sea Island Medical Clinic ("SIMC"), to which he referred in his opinion. (See Tr. 28). Indeed, Plaintiff listed "Genevieve Jones"[6] as her "Family Doctor" (e.g., Tr. 236, 252, 275; see also 337, 366 (SIMC)), and MUSC's discharge orders instructed Plaintiff to follow-up with SIMC (e.g., Tr. 278, 314, 333, 364). There is even an "Authorization for Release of Information" from SIMC to MUSC dated January 17, 2007, signed by Plaintiff (Tr. 247), indicating that Plaintiff visited the clinic at least once during 2007, presumably in compliance with MUSC discharge instructions (e.g., Tr. 278).

Indeed, there is no showing that the ALJ attempted to procure Plaintiff's records from either Roper or SIMC, and the apparent conflicts between her testimony and the MUSC records suggest that Plaintiff's recollection was not accurate. The January 2007 MUSC records show that, contrary to her account, Plaintiff had a three-day hospitalization secondary to pulmonary edema. (See Tr. 252-325). In May 2007, MUSC treated Plaintiff for congestive heart failure, but only overnight. (Tr. 328-87). As Plaintiff referred to a lengthy hospitalization for her "heart and a blockage in [her] arteries," this treatment may have occurred in a Roper facility.

Rather, the ALJ relied on Plaintiff's seeming lack of medical care in making his findings. He stated that there was no documentation that Plaintiff "has sought treatment from anyone other than

---

[6]At least at one point, Dr. Genevieve Jones was a physician at SIMC. See Stroke Belt Elimination Initiative 2004 – 2008: Stroke Belt Community Action Team Plan (SBCAT) 7, http://worst2first. musc.edu/dash/files/cat_plan.pdf.

the emergency room and on one occasion at James Island Family Practice." (Tr. 28). The ALJ added that "[t]here is *no* evidence of record that the claimant attempted to obtain low- or no-cost medical care" (Tr. 28 (emphasis added)), yet SIMC is apparently a facility that offers either free or low-cost medical care, see Free Medical Clinics/Camps All over USA, http://www.freemedicalcamps.com/vcampinfo.php?campid=3800 . The ALJ repeats Plaintiff's statement (Tr. 28) in May 2007 that she had not been to SIMC "in some time" (Tr. 337), yet MUSC's records show that Plaintiff had been there at least four months earlier (see Tr. 247). In formulating Plaintiff's residual functional capacity ("RFC"), the ALJ observes that she "sought medical care primarily from the emergency room and has failed to follow up with additional treatment" (Tr. 29); however, MUSC's records indicate that Plaintiff visited SIMC at least once for follow-up treatment.[7]

Additionally, the ALJ noted that none of Plaintiff's treating physicians opined as to her "functional limitations" (Tr. 29), but the records of her treating physician(s) may include suggested restrictions. Moreover, Plaintiff had no representative to request such opinion(s), and Plaintiff's education is clearly limited. Walker v. Harris, 642 F.2d 712 (4th Cir. 1981), advises remand where the ALJ "fails diligently to explore all relevant facts *especially in cases of uneducated, pro se claimants*" and where nonrepresentation appears to result in prejudice. Id. at 714 (emphasis added). Plaintiff testified that she completed only the ninth grade[8] (Tr. 35), and her "Function Report" reveals that she is neither "a reader" nor "good on counting" (Tr. 121). In fact, it appears that her teenaged

---

[7]The ALJ also wrote that there was no evidence that hand surgery had been recommended (Tr. 28), but the March 6, 2006 MUSC record advises Plaintiff to follow-up with "FCF Clinic for surgery" (Tr. 146).

[8]Even if Plaintiff actually completed the tenth grade, as stated in her Disability Report, that was in 1978, when she would have been almost eighteen years old. (See Tr. 100).

daughter, Martika, completed most of her handwritten forms. (See, e.g., Tr. 59 (Request for Reconsideration, signed by Martika); 67 (Request for Hearing, signed by Martika); 119 (Function Report); 200 ("New Patient Information Sheet")). Martika explained that her mother was once given a pamphlet to read "and she couldn't do it." (Tr. 125).

Because the ALJ's credibility and RFC findings appear to be negatively affected by Plaintiff's lack of medical documentation, which the ALJ stated *he* would obtain, it is recommended that this action be remanded.[9] Cf. Jones v. Sullivan, 949 F.2d 57, 61 (2d Cir. 1991) (finding good cause to remand pro se claimant's case when the claimant clearly "was relying on the ALJ to secure the necessary information from her treating physicians"). The undersigned's recommendations as to Plaintiff's remaining issues, as discussed below, are based on the record as currently formulated and may differ depending on the content of the missing records. Cf. Wilkins v. Secretary, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (new evidence is reviewed, together with the remainder of the record, to determine whether substantial evidence supports the Commissioner's findings).

**B.    Severity**

Plaintiff objects to the ALJ finding that her arthritis and sleep apnea were not severe impairments. It is the claimant's burden to prove that he or she suffers from a medically severe impairment. Bowen v. Yuckert, 482 U.S. 137, 145 n.5 (1987). A severe impairment is one that

---

[9]The Commissioner responds that, "if there are additional medical records from [SIMC] or Roper, and *if* these records somehow support Plaintiff's claim as she now alleges, the Plaintiff's counsel could have obtained them[.]" Def.'s Br. at 18. It appears to the Court, however, that such an argument would relieve the ALJ of any record-building duty, as he or she could always assume that a losing claimant will procure a lawyer who would then obtain the missing records. Defendant's argument disregards the law of the Fourth Circuit as set forth in Marsh, Sims, Crider, and others.

"significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A non-severe impairment is defined as one that does not "significantly limit [a claimant's] physical or mental ability to do basic work activities." Id. § 404.1521(a). Basic work activities include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

Id. § 404.1521(b).

A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" Id. § 404.1508. A claimant's own description of her physical or mental impairment is not enough to establish that there is, in fact, a physical or mental impairment. Id. § 404.1528(a).

The ALJ noted Plaintiff's testimony that she has arthritis in her knees and needs a knee replacement. (Tr. 27). She also based her disability application, in part, on arthritis in her ankles and knees. (See Tr. 95). When Plaintiff saw Dr. Barry Weissglass for her consultative examination, she

complained of arthritis in her left ankle since a 1992 fracture and cracking, but neither locking nor swelling, in her knees. (Tr. 227).

Yet, as the ALJ explained, Dr. Weissglass found only a small amount of crepitus in Plaintiff's knees and no instability, heat, or effusion. (Tr. 28; see also Tr. 228). He described the findings as "minimal." (Tr. 229). Also, the doctor found no crepitus in Plaintiff's ankle, merely decreased range of motion. (Tr. 228). As the Court found in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), a claimant's allegations about her pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment[.]" Id. at 595. Thus, the record, as currently constituted, contains substantial evidence to support the ALJ's finding.

Plaintiff points out that Dr. Weissglass speculated that her musculoskeletal limitations "would make it difficult for her to do repetitive walking, prolonged standing, bending, kneeling, and repetitive lifting[.]" (Tr. 229). But Social Security Ruling ("SSR") 85-28 specifically provides that "*medical evidence alone* is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities." Id. (emphasis added). In addition, a physician with expertise in Social Security law,[10] referring to Dr. Weissglass's report, opined that Plaintiff would be able to stand and/or walk for six of eight hours. (Tr. 220). See SSR 85-28 (providing that a finding of not severe "requires a careful evaluation of the medical findings ... and an informed judgment about its (their) limiting effects"). Thus, the ALJ was justified, on the current record, in relying upon the expert's determination and Dr. Weissglass's minimal findings to find that Plaintiff's arthritis was not severe.

---

[10]State agency medical and psychological consultants "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-9p.

To the extent, however, that the ALJ may have erred in finding Plaintiff's arthritis to be non-severe, Plaintiff has suffered no harm. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error"). A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three. See Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). The undersigned agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps. See, e.g., Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987); Newsome v. Barnhart, 444 F. Supp. 2d 1195, 1200-01 (M.D. Ala. 2006); Ottman v. Barnhart, 306 F. Supp. 2d 829, 839 (N.D. Ind. 2004).

Although the ALJ declined to find Plaintiff's arthritis "severe," he nevertheless accorded "significant weight" to Dr. Weissglass's opinion. (Tr. 29). Also, even though he found Plaintiff's statements "not entirely credible" (Tr. 27), the ALJ gave Plaintiff "the benefit of the doubt," and reduced her RFC "to include limitations in the amount she can sit, stand, walk, lift and carry" (Tr. 29). Because the ALJ thus accounted for limitations that may have been caused by Plaintiff's arthritis, he did not commit reversible error in failing to find it severe.

Plaintiff additionally complains that the ALJ failed to find that her obstructive sleep apnea was a severe impairment. The burden is upon the claimant, not only to provide medical evidence

establishing the existence and severity of his claimed impairments, but also to establish how those impairments affect his functioning. 20 C.F.R. § 404.1512(a).

Plaintiff's medical records establish the existence of her impairment, but the current record contains no evidence of how it significantly limits her physical or mental ability to do basic work activities. See Williamson v. Barnhart, 350 F.3d 1097, 1100 (10th Cir. 2003) ("the mere presence of a condition is not sufficient to make a step-two showing"); Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis ... says nothing about the severity of the condition."). There is no mention of any sleep disorder-related difficulties either on Plaintiff's disability forms or in her medical records. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (finding it "significant" to the severity analysis that plaintiff failed to allege depression in her benefits application). Moreover, when asked by the ALJ why she could not work, Plaintiff cited hand, knee, leg, and ankle difficulties only. (Tr. 42-45).

In fact, Plaintiff's sleep apnea only came to light late in the relevant period, when emergency room staff witnessed a significant desaturation. (See Tr. 277-78). After using a CPAP,[11] Plaintiff stated that she slept well at night. (Tr. 328). Hence, this record supports the absence of obstructive sleep apnea in the ALJ's severity analysis. See SSR 96-8p (when there is neither allegation nor record citation of a certain limitation or restriction, the adjudicator must consider the claimant to have no such limitation or restriction); Fonseca v. Chater, 953 F. Supp. 467, 471 (W.D.N.Y. 1996) (finding the Commissioner's decision supported by substantial evidence, although it did not discuss the

---

[11]An abbreviation of "continuous positive airway pressure," CPAP is "a technique of respiratory therapy, in either spontaneously breathing or mechanically ventilated patients, in which airway pressure is maintained above atmospheric pressure throughout the respiratory cycle by pressurization of the ventilatory circuit." Stedman's Medical Dictionary 421, 1442 (27th ed. 2000) [hereinafter Stedman's].

14

plaintiff's high blood pressure, because the plaintiff "did not allege, in either his disability application or hearing testimony, that he experienced any symptoms or limitations as a result of" that ailment).

### C.     The Listings

In her discussion of obstructive sleep apnea, Plaintiff alleges that the ALJ erred in failing to determine whether this impairment met or equaled Listing 3.10.  This analysis, however, is very different from that of assessing severity.  It takes place at step three of the sequential procedure, where the ALJ is required to compare the claimant's physical and mental impairments with those provided in the "Listing of Impairments" provided at 20 C.F.R. Part 404, Subpart P, Appendix 1[12] (the "Listings").

It is not enough that the impairment has the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment:  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria."  Sullivan v. Zebley, 493 U.S. 521, 530 (1990); see also 20 C.F.R. § 404.1525(d).  The ALJ compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment.  Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment.  20 C.F.R. § 404.1526(a).

Because the ALJ did not find Plaintiff's obstructive sleep apnea to be "severe," there was no reason for him to assess whether it met or equaled a Listing.  The regulations require that the claimant establish "a *severe* medically determinable impairment(s)."  20 C.F.R. § 404.1525(c)(2)(emphasis added); see also id. § 404.1526(a) (providing that, to establish "medical equivalence," the impairment(s) must be "at least equal in *severity* and duration to the criteria of any listed impairment"

---

[12]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. § 416.911.

(emphasis added)); id. § 404.1520(c)(iii) ("At the third step, *we also consider the medical severity of your impairment(s).*" (emphasis added)). Plaintiff's citation to Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986), is not controlling as the Fourth Circuit Court of Appeals there remanded, in part, because the ALJ failed to explain why Cook's *severe* impairment of arthritis did not satisfy Listing 1.01 criteria. Id. at 1173.

Nevertheless, if severe, the ALJ would have analyzed Plaintiff's obstructive sleep apnea under Listing 3.09 or 12.02, as directed by Listing 3.10 ("Sleep-related breathing disorders"). Plaintiff's medical records, however, fail to establish the criteria of "Chronic cor pulmonale and pulmonary vascular disease," see Listing 3.00G,[13] or "Organic Mental Disorders," see Listing 12.02.[14] Accordingly, the record, as it currently stands, fails to establish that Plaintiff's obstructive sleep apnea fits the criteria of Listing 3.10.

## D.   RFC/Step Five Finding

Plaintiff next argues that the ALJ erred in finding that she had the RFC to perform the full range of sedentary work because she also suffered from nonexertional limitations. As a result, the ALJ mistakenly relied on the "grids" to determine that she was not disabled.

---

[13]The establishment of an impairment attributable to irreversible cor pulmonale secondary to chronic pulmonary hypertension requires documentation by signs and laboratory findings of right ventricular overload or failure (e.g., an early diastolic right-sided gallop on auscultation, neck vein distension, hepatomegaly, peripheral edema, right ventricular outflow tract enlargement on x-ray or other appropriate imaging techniques, right ventricular hypertrophy on ECG, and increased pulmonary artery pressure measured by right heart catheterization available from treating sources). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00G.

[14]Plaintiff's records do not show "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain," as they contain no evidence, at the very least, of (i) loss of specific cognitive abilities or affective changes or (ii) history of a chronic organic mental disorder. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

At step five of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). To improve both the uniformity and efficiency of this determination, the Commissioner promulgated the Medical-Vocational Guidelines (the "grids"),[15] located at 20 C.F.R. Part 404, Subpart P, Appendix 2. Heckler v. Campbell, 461 U.S. 458, 461 (1983). Each grid, however,

> considers only the strength or exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability. Thus, in cases where pain occurs only upon exertion and limits one's strength functioning, the grid tables will apply. But when a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may only serve as guidelines.

Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989) (citing Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984)); see also 20 C.F.R. § 404.1569a(d). When the Commissioner is unable to rely on the grids, he must prove through vocational expertise that jobs exist in the national economy which the claimant can perform. Walker, 889 F.2d at 49-50.

Plaintiff asserts that her "nonexertional impairment" results from her bilateral carpal tunnel syndrome ("CTS"), which is evidenced in the record as follows:

---

[15]The grids:
consist of a matrix of the four factors identified by Congress – physical ability, age, education, and work experience – and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.
Heckler v. Campbell, 461 U.S. 458, 461-62 (1983) (footnotes omitted). The grids are applicable to SSI claims pursuant to 20 C.F.R. § 416.969.

• MUSC diagnosis in March 2006 based on positive Phalen's[16] and Tinel's[17] signs (Tr. 145-46; see also Tr. 147-48);

• Dr. Weissglass's listing of CTS among Plaintiff's diagnoses (Tr. 229);

• March 2006 James Island Family Practice ("JIFP") record noting Plaintiff's complaints of numbness and tingling in both hands (Tr. 198);

• Plaintiff's testimony of hand swelling and numbness (Tr. 42-43).

Plaintiff contends that her CTS results in "manipulative limitations" that would erode the sedentary base under SSR 96-9p, which provides, "Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." Id.

SSR 96-9p does provide that unskilled sedentary work involves the nonexertional capacity for manipulation. It further advises that,

> Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base. . . . When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource.

Id. Thus, if Plaintiff's assertions are established, the ALJ would not be able to rely on the grids to satisfy the step five burden.

---

[16]Phalen maneuver: maneuver "in which the wrist is maintained in volar flexion; paresthesia occurring in the distribution of the median nerve within 60 sec[onds] may be indicative of [CTS]." Stedman's at 1061.

[17]"[A] sensation of tingling, or of 'pins and needles,' felt at the lesion site or more distally along the course of a nerve when the latter is percussed; indicates a partial lesion or early regeneration in the nerve." Stedman's at 1640.

The ALJ wrote that, although MUSC assessed Plaintiff with CTS, there is no record that it was evaluated by an objective study. (Tr. 28). Review of the record, however, reveals that JIFP had "consider[ed]" such a study (Tr. 198), Plaintiff told the state disability worker that her CTS treatment included a "test" (Tr. 99), and Dr. Weissglass wrote that Plaintiff's CTS had been diagnosed by a nerve conduction study (Tr. 227). The ALJ also relied on the absence of a surgical option (Tr. 28), but the MUSC physician *did* recommend surgery (Tr. 146).

The ALJ further observed that Plaintiff's hand x-rays were "generally unremarkable" (Tr. 28), yet "[t]his objective finding is of little relevance because x-rays are not among the diagnostic tools typically used to evaluate [CTS]." Jenkins-Dewindt v. Astrue, No. 5:07-cv-314-Oc-10GRJ, 2008 WL 3889736, *7 (M.D. Fla. Aug. 20, 2008 ) (citing Nat'l Inst. of Neurological Disorders & Stroke, "Carpal Tunnel Syndrome Fact Sheet" (Nat'l Inst. Health, Pub. No. 03-4898, 2002)). But the ALJ did correctly note that Dr. Weissglass failed to find either a Tinel's or Phalen's sign and deemed Plaintiff's CTS exam "negative." (See Tr. 228, 229). Overall, however, the ALJ's misstatement of the record fails to support his decision not to believe Plaintiff "regarding the extent of her limitation related to" her CTS. (Tr. 28).

At step three, the ALJ determined that Plaintiff's CTS had "not resulted in an inability to perform fine and gross movements effectively,"[18] referring to Listing 1.02, or "in a significant

---

[18][E]xamples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c.

disorganization of motor function,"[19] referring to Listing 11.00C. (Tr. 26). These levels of severity, however, are not required in order for the record to establish that Plaintiff suffered a manipulative limitation such that vocational testimony was required. Plaintiff's Disability Report records her complaint of constant hand pain with "no strenght [sic] to pick up anything." (Tr. 96). The state agency worker who assisted with her reporting observed that Plaintiff had difficulty using her hands and with writing. (Tr. 103). Her daughter, Martika, explained that Plaintiff's cooking habits have changed because of fear that she will "burn or drop a hot pot" as "her hands are not the same as it [sic] used to be." (Tr. 122). Martika stated that her mother used to "make her own clothing," but no longer does as "her hands are not as healthy" as they once were. (Tr. 123). She added that Plaintiff's hands were weak and numb. (Tr. 124).

Unlike with Plaintiff's lower extremity complaints, the ALJ's RFC finding failed to account for any manipulative limitations.[20] Even the state medical consultant, whose opinion the ALJ accorded "significant weight" (Tr. 29), opined that Plaintiff's handling and fingering were limited (Tr. 222). Because, as indicated by SSR 96-9p, upper extremity restrictions are so significant at the sedentary level, the undersigned finds that the ALJ erred in relying on the grids to support his "not disabled" decision, rather than consulting a vocational expert.

---

[19]Listing 11.00 provides that "persistent disorganization of motor function" can take the form of paresis, paralysis, involuntary movements, ataxia, or sensory disruption, either singly or in combinations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00C.

[20]Plaintiff also refers to her nonexertional limitations of bending and kneeling, as found by Dr. Weissglass, but SSR 96-9p states that postural restrictions related to kneeling – bending the legs alone, SSR 85-15 – would not significantly erode the occupational base for unskilled sedentary work. Further, SSR 83-10 explains that sedentary work involves no significant "stooping," i.e., "bending the body downward and forward by bending the spine at the waist," SSR 85-15.

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to complete development of the record as more particularly instructed herein and, thereafter, to re-evaluate his findings in view thereof.

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), and that the case be remanded to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

November 24, 2009
Columbia, South Carolina