# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Gail Washington, | ) C/A No. 3:08-CV-02631-DCN-JRM |
| Plaintiff, | ) |
| vs. | ) |
| Michael J. Astrue, Commissioner of Social Security, | ) **ORDER & OPINION** |
| Defendant. | ) |

This matter is before the court on Magistrate Judge Joseph McCrorey's report and recommendation, made in accordance with 28 U.S.C. § 636(b)(1)(B), that this court reverse the decision of the Commissioner denying plaintiff's application for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42. U.S.C. §§ 410-33, 1381-83. Defendant has filed written objections to the report and recommendation. For the reasons set forth below, the court adopts the report and recommendation of the magistrate judge and reverses and remands the case for further consideration by the Commissioner.

## I. BACKGROUND

Plaintiff first filed for DIB and SSI in March 2006 alleging she became disabled on January 1, 2005, due to low back pain, arthritis in her knees and ankles, high blood pressure, carpal tunnel syndrome, obesity, and depression. Tr. 89. Her application was denied initially and upon reconsideration. Tr. 49-51, 53-57, 60-65. Plaintiff requested an administrative hearing, which was held on October 15, 2007. Tr. 32-48. On November

1

9, 2007, the administrative law judge (ALJ) issued a decision finding plaintiff was not disabled within the meaning of the Social Security Act. Tr. 22-31. On May 28, 2008, the Appeals Council rendered the Commissioner's determination final when it denied plaintiff's request to review the ALJ's decision. Tr. 2-6.

Plaintiff was born on July 16, 1960. Tr. 35. She has a ninth grade education and worked in the past as a cook and tomato sorter. Tr. 35, 38, 96-97, 100. Plaintiff initially alleged disability beginning January 1, 1992. Tr. 22. The record shows that claimant's disability onset date was amended to January 1, 2005. Tr. 22. Plaintiff alleges that she became disabled due to multiple symptoms, including low back pain, arthritis in her knees and ankles, high blood pressure, carpal tunnel syndrome, obesity, and depression. Tr. 95. Plaintiff, who is currently represented by counsel, was unrepresented at the hearing before the ALJ. Tr. 35.

Plaintiff's medical evidence in the record relates primarily to the treatment provided to plaintiff at the Medical University of South Carolina (MUSC) over a period of approximately thirteen years. Plaintiff had surgery on her left ankle in April 1994. Tr. 189-91. Plaintiff underwent surgery for a trimalleolar left ankle fracture consisting of open reduction with internal fixation using interfragmentary screws. Tr. 189-91. Plaintiff was seen in September 1996 for a left knee injury caused by a fall. Tr. 182. X-rays revealed an accessory ossification center at the tibial tuberosity. Tr. 182. In 1997, x-rays of plaintiff's chest showed "mild cardiomegaly" (enlarged heart) and spondylosis (degenerative changes) at thoracolumbar (mid-to-low back) junction. Tr. 177. In January 2001, plaintiff's chest x-rays showed an enlarged cardiac silhouette with

prominent soft tissue density and no pulmonary infiltrates. Tr. 171. In March 2001, plaintiff underwent surgery at MUSC consisting of an open cholecystectomy due to chronic cholecystitis. Tr. 166-70.

On March 2, 2006, plaintiff was treated by Anne Anderson, M.D., at James Island Family Practice. Plaintiff complained of headaches and numbness and tingling in her hands. Tr. 197. Dr. Anderson diagnosed hypertension, tachycardia (fast heart rate), numbness in the upper extremities, headaches, and obesity. Tr. 197.

On March 3, 2006, plaintiff was treated at the MUSC emergency room with complaints of pain in her right hand. Tr. 147-48. Examination of her hands showed Tinel's and Phalen's signs, indicative of carpal tunnel syndrome. Tr. 147-48. The physician diagnosed carpal tunnel syndrome and prescribed a wrist splint and pain medication. Tr. 147-48. Plaintiff returned three days later with complaints of bilateral hand and wrist pain. Tr. 145-46. The physician diagnosed carpal tunnel syndrome and again prescribed a left wrist splint and pain medications. Tr. 145-46.

Plaintiff was seen again in January 2007 at the MUSC emergency room due to shortness of breath and cough with pleuritic chest pain. Tr. 236-44. She was given medication and sent home after being examined by a physician. Tr. 236-44. She returned to the ER several days later for the same symptoms. Tr. 252-67. Plaintiff was admitted to the hospital on January 8, 2007, and was discharged the following day with diagnoses of pulmonary edema, hypertension, and possible obstructive sleep apnea. Tr. 277-78. On May 21, 2007, plaintiff sought treatment at the MUSC emergency room due to shortness of breath and chest pain. Tr. 332-33. Plaintiff's chest x-ray revealed mild

pulmonary edema, while a myocardial perfusion scan was reported to be normal. Tr. 381-83. An EKG showed normal sinus rhythm with sinus arrhythmia and some non-specific T-wave abnormalities. Tr. 382. A stress test revealed sinus tachycardia with no ischemic changes. Tr. 382. The final report in the record from MUSC indicates that plaintiff went to the ER again for chest pain on August 8, 2007, and an x-ray revealed bilateral lower lobe patchy opacification likely due to pulmonary adema. Tr. 403.

Plaintiff underwent a sleep study at MUSC on February 7, 2007. Tr. 326-27. She was reported to have demonstrated severe life threatening sleep apnea with severe desaturations to 46% which required emergency CPAP application. Tr. 326-27. Plaintiff was diagnosed with "Severe Obstructive Sleep Apnea/Hypopnea Syndrome." Tr. 326.

Plaintiff was examined by Dr. Barry L. Weissglass on November 22, 2006, in conjunction with her application for disability benefits. Tr. 227. According to Dr. Weissglass' examination, plaintiff was positive for some crepitus on passive range of motion testing of both knees, as well as for pain on manipulation of the left ankle, with decreased range of motion "especially in dorsiflexion and eversion." Tr. 228. Dr. Weissglass noted that she had negative Tinel and Phalen signs on that day. Tr. 228.

Dr. Weissglass assessed plaintiff with arthritis of her knees and left ankle, uncontrolled hypertension, carpal tunnel syndrome, obesity and tachycardia. Tr. 229. Dr. Weissglass did note that his assessment of plaintiff's carpal tunnel syndrome was based on plaintiff's history of nerve conduction studies, although the exam on that date was negative. Tr. 229. He opined that plaintiff should be limited from repetitive lifting, walking, prolonged standing, bending, and kneeling. Tr. 229. With regard to her

hypertension and tachycardia, Dr. Weissglass stated that plaintiff's limitations were unclear since he did not have objective data available. Tr. 229. He stated that until such information was available, it would be important for plaintiff to avoid activities that required significant aerobic involvement and should limit her activity level significantly. Tr. 229. Lastly, he noted that plaintiff's headaches and obesity should not significantly limit her ability to work except that jobs should not require her to be particularly agile. Tr. 229.

George Chandler, M.D., a state agency physician, reviewed the evidence in December 2006, and concluded that plaintiff could lift/carry fifty pounds occasionally and twenty-five pounds frequently; sit or stand/walk about six hours each in an eight-hour workday; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds, and that she should avoid "constant" handling and fingering.[1] Tr. 219-26. Also in December 2006, Jeffery Vidic, Ph.D., a state agency psychologist, reviewed the evidence and found that plaintiff had only mild limitations in daily activities, social functioning, and concentration, and had no extended episodes of mental decompensation. Tr. 205-18.

An administrative hearing took place on October 15, 2007. Tr. 32. Plaintiff testified that she was five feet six inches tall and weighed 317 pounds. Tr. 39. She said she received most of her treatment from the emergency rooms at MUSC and Roper St. Francis Healthcare (Roper) because she did not have medical insurance. Tr. 39. Plaintiff

---

[1] "Handling" is defined as "gross manipulation," while "fingering" is defined as "fine manipulation." Tr. 222.

testified that she had to go to MUSC in January 2007 for problems with her heart and blocked arteries, where she stated they kept her for over a week and put her on medication. Tr. 6-7. She said she tried to "stretch out" her medications by taking them "every other day." Tr. 39. She stated that she worked for short periods of time in 2005 and 2006, and that she stopped working at her job sorting tomatoes after two months because she was not allowed to sit down. Tr. 36-37. Plaintiff testified that she could not go back to work as a cook due to numbness, pain, and swelling in her legs and hands. Tr. 42. She testified that she could not perform a sitting job because she had numbness from her leg up to her hip. Tr. 42-43. Arthur Schmitt, a vocational expert, testified that plaintiff had past work as a cook and tomato sorter, and that both of these jobs were performed in a standing position. Tr. 46-47. Plaintiff stated that her doctors instructed her to keep her leg elevated and not to stand for prolonged periods. Tr. 43-44. She further testified that Dr. Weissglass told her not to stand at all. Tr. 44.

Plaintiff testified that she had arthritis in her knees and needed a "knee replacement." Tr. 38. She testified she also had carpal tunnel syndrome and problems with her ankles. Tr. 38. Plaintiff testified that she had most recently sought treatment for her heart at MUSC and had been hospitalized for over a week in January 2007. Tr. 39-40. Plaintiff stated she also sought treatment for similar complaints at Roper but had not been admitted. Tr. 39-40. Plaintiff testified that since 2007 she took heart and blood pressure medications and used a CPAP machine for sleep apnea.

At the end of the administrative hearing, the ALJ stated, "I don't have all the records, okay? The reason I don't have all the records is because you were hospitalized

in January of this year. I don't have those records, okay? And obviously, if you went to Roper at all, I don't have those records as well." Tr. 41-42. The ALJ then stated, "I will have to, after this hearing is over, contact MUSC, and contact Roper. I will update the treatment records for you this year. After I've gotten all those records, I will make a decision, okay?" Tr. 41-42.

      The ALJ applied the five-step sequential evaluation process for determining whether an individual is disabled in accordance with the Social Security Act. Tr. 19-31. First, the ALJ determined that plaintiff met the insured status requirements of the Social Security Act through December 31, 2009. Tr. 24. At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 2005. Tr. 24. At step two, the ALJ found that plaintiff had the severe impairments of obesity, tachycardia, and carpal tunnel syndrome. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. Tr. 24-26. The ALJ found that plaintiff had the residual functional capacity (RFC) to sit for six hours of an eight hour day; stand/walk for two hours of an eight hour day; frequently lift/carry light items; and occasionally lift ten pounds. Tr. 26. At step four, the ALJ determined that plaintiff was unable to perform any of her past relevant work. Tr. 30. At step five, the ALJ found that considering plaintiff's age, education, work history, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she could perform. Tr. 30. Consequently, the ALJ found that plaintiff was not under a "disability" as defined in the Social Security Act from January 1, 2005,

through the date of the decision. Tr. 30.

## II. STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the magistrate judge's report to which a specific, written objection is made. 28 U.S.C. § 636(b)(1). A party's failure to object is accepted as agreement with the conclusions of the magistrate judge. See Thomas v. Arn, 474 U.S. 140 (1985). This court is not required to review, under a de novo standard, or any other standard, the factual findings and legal conclusions of the magistrate judge to which the parties have not objected. See id. at 149-50. A party's general objections are not sufficient to challenge a magistrate judge's findings. Howard v. Secretary of Health & Human Servs., 932 F.2d 505, 508-09 (6th Cir. 1991). The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination remains with this court. Mathews v. Weber, 423 U.S. 261, 270 (1976). This court may accept, reject, or modify the report of the magistrate judge, in whole or in part, or may recommit the matter to him with instructions for further consideration. 28 U.S.C. § 636 (b)(1).

Although this court reviews the magistrate judge's recommendation de novo, judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" has been defined as,

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence."

Id. (internal citations omitted). "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." Id. Instead, when substantial evidence supports the Commissioner's decision, this court must affirm that decision even if it disagrees with the Commissioner. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." Hays, 907 F.2d at 1456.

### III. DISCUSSION

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a sequential evaluation process to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520, 416.920. Under this process, the ALJ must determine, in sequence: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether that severe impairment meets or equals an illness contained in 20 C.F.R. Part 4, Subpart P, Appendix 1, which warrants a finding of disability without considering vocational factors; (4) if not, whether the impairment prevents him or her from performing past relevant work; and (5) if so, whether the

9

claimant is able to perform other work considering both his remaining physical and mental capabilities (defined as Residual Functional Capacity or "RFC") and his vocational capabilities (age, education, and past work experience) to adjust to a new job. Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981). see also Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920). The applicant bears the burden of production and proof during the first four steps of the inquiry. Pass, 65 F.3d at 1203 (citing Hunder v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)). If the sequential evaluation process proceeds to the fifth step, the burden shifts to the Commissioner to show that other work is available in the national economy that the claimant should perform. Id.; see also Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (discussing burden of proof).

### A. Failure to Develop the Record

The magistrate judge found that the ALJ erred by failing to develop the record, as he did not obtain evidence plaintiff referenced in her hearing testimony. Magistrate's Recommendation and Report (cited herein as Report) at 10. It is well-established in the Fourth Circuit that a claimant, appearing pro se, is "entitled to the sympathetic assistance of the ALJ to develop the record, to assume a more active role and to adhere to a heightened duty of care and responsibility." Crider v. Harris, 624 F.2d 15, 16 (4th Cir. 1980) (internal quotation marks and citation omitted). When presented with a pro se claimant, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." Marsh v. Harris, 632 F.2d 296,

299 (4th Cir. 1980) (internal quotation marks and citations omitted). If the ALJ's failure to do so results in less than a "full and fair hearing of their claims," then "good cause" may exist to remand "for the taking of additional evidence." Sims v. Harris, 631 F.2d 26, 27 (4th Cir. 1980).

The hearing transcript reveals that the ALJ was familiar with plaintiff's record, and he questioned her as to where she received medical treatment. Tr. 38-45. Plaintiff told the ALJ she received treatment from several different doctors in different emergency rooms. Tr. 39. Plaintiff specifically told the ALJ she received treatment at MUSC and Roper. Tr. 39. Following this discussion, the ALJ explained, "I don't have all the records, okay? And the reason why I don't have all the records is because you were hospitalized in January of this year. I don't have those records." Tr. 47. The ALJ continued by saying, "If you went to Roper at all, I don't have those records, as well." Tr. 47. The ALJ then clearly stated to plaintiff, "I will have to, after this hearing is over, contact MUSC, and contact Roper. I will update the treatment records for you for this year. After I've gotten all those records, I will make a decision, okay?" Tr. 47. The ALJ then explained to plaintiff that he cannot make a decision if he "does not have all of the information." Tr. 47-48. He stated again just before he closed the hearing that he would get the medical records for plaintiff. Tr. 47-48.

As the magistrate judge noted, the ALJ perceived a gap in plaintiff's treatment records, and the final transcript shows the he was partially effective in filling that gap, as there are records from MUSC dating through August 2007. Tr. 234-406. The transcript also shows that the ALJ acted on his representations quickly, as the records were

11

received on October 15, 2007; the same day as plaintiff's hearing. Tr. 234.

Plaintiff contends that the ALJ erred in not obtaining her medical records from Roper or Sea Island Medical Clinic (SIMC), to which he referred in his disability decision. Tr. 28. Plaintiff listed Genevieve Jones (once a physician at SIMC) as her "Family Doctor," and MUSC's discharge orders instructed plaintiff to follow-up with SIMC. Tr. 236, 252, 278, 314, 333, 364, 366. The magistrate judge noted that there was an "Authorization for Release of Information" from SIMC to MUSC dated January 17, 2007, signed by plaintiff, indicating that plaintiff visited the clinic at least once during 2007. Report at 9 (citing Tr. 247, 278).

Furthermore, the ALJ realized during the hearing that plaintiff had also received treatment at Roper for her impairments. He specifically stated he would obtain her medical records from Roper. The apparent conflicts between the testimony and the MUSC records suggest that plaintiff's recollection was not accurate. The January 2007 MUSC records show that, contrary to her account, plaintiff had a three-day hospitalization secondary to pulmonary edema. Tr. 252-325. In May 2007, MUSC treated plaintiff for congestive heart failure, but only overnight. Tr. 328-87. Plaintiff referred to a lengthy hospitalization for her "heart and a blockage in her arteries." This treatment may have occurred at Roper. Tr. 6-7.

The ALJ relied on plaintiff's seeming lack of medical care in his disability decision. He stated that there was no documentation that plaintiff "has sought treatment from anyone other than the emergency room and on one occasion at James Island Family Practice." Tr. 28. The ALJ further stated that, "there is no evidence of record that the

12

claimant attempted to obtain low or no-cost medical care." Tr. 28. However, the magistrate judge pointed out that, "SIMC is apparently a facility that offers either free or low-cost medical care." Report at 9.

The ALJ repeated plaintiff's statement in May 2007 that she had not been to SIMC "in some time," yet MUSC's records show that plaintiff had been there approximately four months earlier. Tr. 28, 337, 247. The ALJ stated in regard to plaintiff's residual functional capacity that she "sought medical care primarily from the emergency room and has failed to follow up with additional treatment." Tr. 29. However, as the magistrate judge pointed out, MUSC's records indicate that plaintiff visited SIMC at least once for follow-up treatment. Tr. 247. The ALJ stated that none of plaintiff's treating physicians opined as to her functional limitations, but the records of her treating physicians at Roper or SIMC may include suggested functional limitations. Tr. 29.

The government contends that any arguable error in regard to the incomplete record referenced in plaintiff's hearing testimony was harmless. Furthermore, the government argues that although the ALJ has a duty to develop the record, the burden of proving disability and the risk of non-persuasion falls on the claimant. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Seacrist v. Weinberger, 538 F.2d 1054, 1057 (4th Cir. 1996). The government notes that when a party fails to present evidence which would normally be expected to support her case, that fact supports an inference that the evidence would not be favorable to her position. See Welsh v. Gibbons, 46 S.E. 2d 147 (S.C. 1948); Hutchinson v.

Bowen, 697 F. Supp. 1401, 1407 n.19 (E.D. Va. 1988).

The government responded to the magistrate's recommendation by stating that "if there are additional medical records from SIMC or Roper, and if these records somehow support plaintiff's claim as she now alleges, plaintiff's counsel could have obtained them." Def.'s Br. at 18. However, the magistrate correctly noted that such an argument would appear to relieve the ALJ from any record-building duty to a pro se claimant, as he or she could always assume that a losing claimant will procure a lawyer who would then obtain the missing records. Report at 10 n.9. Precedent clearly recognizes the ALJ's duty to develop the record for a pro se claimant. See Marsh, 632 F.2d at 299; Crider, 624 F.2d at 16.

In Walker v. Harris, 642 F.2d 712 (4th Cir. 1981), the Fourth Circuit said remand is appropriate where the ALJ "fails diligently to explore all relevant facts especially in cases of uneducated, pro se claimants" and where nonrepresentation appears to result in prejudice. Id. at 714. Plaintiff's "Function Report" states that she is not a good reader or good with numbers. Tr. 121. As the magistrate judge noted, it appears that plaintiff's teenaged daughter completed most of her handwritten forms. Tr. 59, 67, 119, 200. Plaintiff had no representation to help request her medical records, and plaintiff's education is clearly limited.

The ALJ recognized the record was incomplete, and specifically stated to plaintiff that he would obtain her medical records. It is clear that all of plaintiff's medical records were not obtained by the ALJ, and he did not review all of the available evidence in making his credibility and RFC findings. For these reasons, this action will be remanded

14

to the Commissioner to complete development of the record and to reevaluate his findings as necessary. See Jones v. Sullivan, 949 F.2d 57, 61 (2d Cir. 1991) (finding good cause to remand pro se claimant's case when the claimant clearly "was relying on the ALJ to secure the necessary information from her treating physicians").

### B. RFC/Step Five Finding

The government also objects to the magistrate judge's finding that the ALJ mistakenly relied on the "grids"—as opposed to consulting the vocational expert—to determine that plaintiff was not disabled. As noted above, the Commissioner bears the burden of showing the existence of a significant number of jobs in the national economy that plaintiff could perform. To aid in making this determination, the Commissioner promulgated the Medical-Vocational Guidelines (the "grids"), located at 20 C.F.R. Part 404, Subpart P, Appendix 2. Heckler v. Campbell, 461 U.S. 458, 461 (1983). Each grid, however,

> considers only the strength or exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability. Thus, in cases where pain occurs only upon exertion and limits one's strength functioning, the grid tables will apply. But when a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may only serve as guidelines.

Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989) (citing Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984)); see 20 C.F.R. § 404.1569a(d). When the Commissioner is unable to rely on the grids in making the step five determination, he must use a vocational expert to prove that jobs exist in the national economy which the claimant can perform. Walker, 889 F.2d at 49-50.

Plaintiff asserts that her "nonexertional impairment" results from her bilateral

15

carpal tunnel syndrome, which the record supports as follows: MUSC diagnosis in March 2006 based on positive Phalen's and Tinel's signs; Dr. Weissglass's listing of carpal tunnel syndrome among plaintiff's diagnoses; March 2006 James Island Family Practice record noting plaintiff's complaints of numbness and tingling in both hands; plaintiff's testimony of hand swelling and numbness. Tr. 42-43, 48, 145-46, 229. Plaintiff contends that her carpal tunnel syndrome results in "manipulative limitations" that would erode the sedentary base under Social Security Ruling 96-9p, which provides, "Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." Id.

Social Security Ruling 96-9p provides that unskilled sedentary work involves the nonexertional capacity for manipulation. It further advises that,

> Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base. . . . When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource.

Id. Thus, if plaintiff's assertions are established, the ALJ would not be able to rely on the grids to satisfy the step five burden.

The ALJ wrote that, although MUSC assessed plaintiff with carpal tunnel syndrome, there is no record that it was evaluated by an objective study. Tr. 28. The record does not support such a finding. Review of medical evidence reveals that James Island Family Practice had "consider[ed]" such a study, plaintiff told the state disability

worker that her carpal tunnel syndrome treatment included a "test," and Dr. Weissglass wrote that plaintiff's carpal tunnel syndrome had been diagnosed by a nerve conduction study. Tr. 99, 198, 227. The ALJ also relied on the absence of a surgical option, but the MUSC physician *did* recommend surgery. Tr. 28, 146. The ALJ further observed that Plaintiff's hand x-rays were "generally unremarkable" (Tr. 28), but "[t]his objective finding is of little relevance because x-rays are not among the diagnostic tools typically used to evaluate carpal tunnel syndrome." Jenkins-Dewindt v. Astrue, 2008 WL 3889736, *7 (M.D. Fla. Aug. 20, 2008 ) (citing Nat'l Inst. of Neurological Disorders & Stroke, "Carpal Tunnel Syndrome Fact Sheet" (Nat'l Inst. Health, Pub. No. 03-4898, 2002)). Though the ALJ did correctly note that Dr. Weissglass failed to find either a Tinel's or Phalen's sign and deemed plaintiff's exam "negative" for carpal tunnel syndrome, the ALJ's overall misstatement of the record fails to support his decision not to believe plaintiff "regarding the extent of her limitation related to" her carpal tunnel syndrome. Tr. 28.

At step three, the ALJ determined that plaintiff's carpal tunnel syndrome had "not resulted in an inability to perform fine and gross movements effectively," referring to Listing 1.02, or "in a significant disorganization of motor function," referring to Listing 11.00C. Tr. 26. These levels of severity, however, are not required in order for the record to establish that plaintiff suffered a manipulative limitation such that vocational testimony was required. Plaintiff's Disability Report records her complaint of constant hand pain with "no strenght [sic] to pick up anything." Tr. 96. The state agency worker who assisted with her reporting observed that plaintiff had difficulty using her hands and

17

with writing. Tr. 103. Her daughter, Martika, explained that plaintiff's cooking habits have changed because of fear that she will "burn or drop a hot pot" as "her hands are not the same as it [sic] used to be." Tr. 122. Martika stated that her mother used to "make her own clothing," but no longer does as "her hands are not as healthy" as they once were. Tr. 123. She added that plaintiff's hands were weak and numb. Tr. 124.

Unlike with plaintiff's lower extremity complaints, the ALJ's RFC finding failed to account for any manipulative limitations. Even the state medical consultant, whose opinion the ALJ accorded "significant weight," opined that plaintiff's handling and fingering were limited. Tr. 29, 222. Because, as indicated by SSR 96-9p, upper extremity restrictions are so significant at the sedentary level, the court finds that the ALJ erred in relying on the grids to support his "not disabled" decision, rather than consulting the vocational expert.

## IV.  CONCLUSION

For the foregoing reasons, it is **ORDERED** that the Commissioner's decision to deny plaintiff disability benefits is **REVERSED** and this case is **REMANDED** to the Commissioner for further proceedings consistent with this order and opinion.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**March 17, 2010**
**Charleston, South Carolina**